# NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2021 CJ 0317

STATE OF LOUISIANA IN THE INTEREST OF J.T.; J.A.; A.T.

Consolidated with

2021 CJ 0318

STATE OF LOUISIANA IN THE INTEREST OF
A.T.; J.T.; J.T.; B.T.; J.T.; B.B.A.

Consolidated with

2021 CJ 0319

STATE OF LOUISIANA IN THE INTEREST OF A.T.; B.T.; J.T.

Consolidated with

2021 CJ 0320

STATE OF LOUISIANA IN THE INTEREST OF J.T.

Judgment Rendered: __OCT 0 7 2021__

* * * * * * *

APPEALED FROM THE TWENTY-FIRST JUDICIAL DISTRICT COURT
IN AND FOR THE PARISH OF TANGIPAHOA
STATE OF LOUISIANA
DOCKET NUMBERS J-18540, J-18276, J-18278, J-18380, DIVISION "I"

HONORABLE BLAIR EDWARDS, JUDGE

* * * * * * *

Counsel of record:

C. Glenn Westmoreland                    Attorney for Appellant
Albany, Louisiana                        A.A.

Kimberly Avery                           Attorney for Appellee
Livingston, Louisiana                    Department of Children
                                         And Family Services

Kellie Johnson                           Attorney for Appellees
Livingston, Louisiana                    MHAS/Child Advocacy
                                         Program on behalf of
                                         the minor children
                                         J.T., J.A., and A.T.

**BEFORE: McDONALD, LANIER, and WOLFE, JJ.**

**McDONALD, J.**

In this case, a mother appeals a judgment that terminated her parental rights to three of her minor children and certified the children as eligible for adoption.[1,2] After review, we affirm.

## FACTS AND PROCEDURAL HISTORY

In October of 2018, J.T. (born January 22, 2016), and J.A. (born November 7, 2017), and A.T. (born November 1, 2010), were removed from the custody of their mother, A.A., and placed in State custody by instanter order. A.A. had been using drugs while acting as caretaker to the children and had put them at risk. On October 3, 2018, the Department of Children and Family Services (DCFS) received results from hair sample testing showing that A.A., as well as J.A. and A.T., tested positive for methamphetamines. A.A. had a prior history of drug use as both she and J.A. tested positive for methamphetamines two days after J.A.'s birth. The children's father, T.T., resided in Alabama. T.T. was aware of A.A.'s drug use and lack of supervision of the children and failed to take action to protect them.

On October 19, 2018, DCFS held its first Family Team Meeting and introduced a case plan with the goal of reunification. A.A. was present at the meeting and was given a copy of the case plan. To meet the goal of reunification, the case plan required A.A. to refrain from using any mind or mood altering substances, obtain safe and stable housing for herself and her children, resolve her pending legal charges, obtain full-time employment, work openly and honestly with DCFS,

---

[1] The judgment also terminated the parental rights of the father of the children, T.T., who has not appealed the judgment. A.A. and T.T. have three older minor children, B.T. (born November 14, 2005), J.T. (born November 9, 2007), and J.T. (born December 22, 2009), who were placed in the custody of B.T., their paternal aunt in Alabama.

[2] The initials of the children and the parents are used to protect the identity of the minor children. See Uniform Rules-Courts of Appeal, Rules 5-1 and 5-2.

complete a domestic violence program, and make parental contributions toward the care of the children in the amount of $100.00 per month.

On October 25, 2018, the District Attorney's Office filed a child in need of care petition for J.A. and J.T., stating that the case was deemed valid for neglect/lack of adequate supervision as to A.A. as she had left the children with inadequate caretakers. One caretaker was D.A., A.A.'s mother, who had been assessed as an inappropriate caretaker several times. The children had been removed while in D.A.'s care, and D.A. had failed to send the children to school. The other caretaker was L.B., A.A.'s live-in boyfriend and a known drug user who had used illicit substances in the presence of the children. The petition further maintained that A.A. did not make an appropriate safe plan for the children while she was using drugs, that A.A. had a history of domestic violence, cocaine use, and selling prescription drugs in Alabama, and that A.A. fled Alabama with her children and moved to Louisiana after she was asked to submit to a drug screen in Alabama while they were under a Safety Plan in Alabama. On October 29, 2018, the District Attorney's Office amended the child in need of care petition to include A.T.

In December 20, 2018, after a disposition hearing, the juvenile court found that reasonable efforts were made to prevent the removal of the children from the home, ordered that the children remain in the custody of DCFS, and set another hearing for February 7, 2019. A.A. was present at the hearing. After the February 7, 2019 disposition hearing, the juvenile court found DCFS had proved the allegations of the petition by a preponderance of the evidence and adjudicated the children in need of care. The juvenile court found that DCFS had made reasonable efforts to prevent the children's removal, and set another disposition hearing for March 28, 2019. A.A. was present at the hearing.

A DCFS report on March 18, 2019, to the juvenile court found that A.A. and

4

T.T. were not working the case plan. A.A. reported that she completed an assessment with the Florida Parishes Human Services Authority but she failed to sign a release for DCFS to obtain that information. A.A. reported she had a job, but that could not be verified. The case plan goal was reunification with a concurrent goal of adoption. The case plan required A.A. to complete an approved substance abuse program; refrain from using mind or mood altering substances; maintain safe and adequate housing; resolve water bill issues that kept her from having water in the home; verify legal employment adequate to support herself and her children; contribute $100.00 per month toward her children's foster care; complete a mental health evaluation due to previous statement of self-medicating with Adderall; complete an approved parenting program and follow recommendations given; resolve pending criminal issues; and refrain from committing further illegal acts.

The DCFS report stated that A.T. loved her foster family and she did not want to stay anywhere else. Further, after initial difficulties in school, A.T. was thriving in school and loved her school and her teachers. J.T. and J.A. loved their foster home and were happy and content there. DCFS recommended that J.T., J.A., and A.T. remain in DCFS custody in their current placements and that the goal remain reunification with a concurrent goal of adoption. DCFS recommended that the current placements were the least restrictive and the most appropriate, and asked that the matter be set for a permanency hearing in September 2019.

At the March 28, 2019 case review hearing, the juvenile court found that DCFS had made reasonable efforts to reunite A.A. and T.T. with J.T., J.A., and A.T., that the case plan was in the best interest of the children, and ordered that custody of J.T., J.A., and A.T. remain with DCFS, with a goal of reunification with a concurrent goal of adoption. A.A. was present at the hearing. A permanency hearing was set for September 19, 2019. On June 24, 2019, CASA worker Jan Pretus was appointed

5

by the juvenile court to represent J.T., J.A. and A.T. and advocate for their best interest.

On August 8, 2019, B.T., the children's paternal aunt, filed a petition to intervene and for guardianship and/or custody of J.T., J.A., and A.T. B.T. maintained that she had custody of the children's three siblings, and that she should be granted full custody and/or guardianship of J.T., J.A., and A.T. The petition was denied by the juvenile court.

On September 10, 2019, DCFS submitted a report to the juvenile court. DCFS reported that neither parent was working any part of the case plan. While A.A. reported that she was working in Shreveport, she was located at T.T.'s address, and two of the children who were in the custody of B.T. were located in the home with A.A. A.A. was taken into custody by law enforcement due to an outstanding warrant in St. Helena Parish for interfering with the custody of a child. When DCFS asked A.A. for her address, she stated she was living between Louisiana, Alabama, and Georgia. Alabama DCFS reported that B.T. had allowed A.A. to bring the three older children in B.T.'s custody with her unsupervised to Louisiana in July 2019. B.T. reported that when she asked A.A. to return those children, A.A. refused. When the three older children were taken into custody on August 27, 2019, in Alabama, they had never started school.

The DCFS report stated that foster care workers had monthly visits with J.T., J.A., and A.T. and found that they all had excellent care in safe, stable environments. Their caregivers made them available for all scheduled appointments, court dates, visitations, and ensured that they attended school or daycare regularly. DCFS reported that the last visitation between A.A. and J.T., J.A., and A.T. had occurred at the DCFS office on August 2, 2019. A.A. showed up for the visit with her three older children and a teenaged niece. A.T. refused to visit with her mother. The visit

6

was chaotic, with all of the children running in and out of the visitation room. At the end of the visit, A.T. visited with all of her siblings. A.A. tried to get one of the children, B.T., to sneak a cell phone into the visitation despite being told she could not bring the phone. While visiting with A.T., B.T. became belligerent, cursed a DCFS worker and a foster parent, and had to be escorted out of the visitation room. B.T. refused to leave the premises and law enforcement was called to remove her after she issued physical threats to the DCFS worker. DCFS recommended continued DCFS custody in J.T., J.A., and A.T.'s foster care placements, and that the goal be changed to adoption with a concurrent goal of guardianship. Neither parent had made any effort to work their case plans to be reunited with J.T., J.A., and A.T., and no viable relatives had been located to take custody.

A CASA report dated September 9, 2019, found that A.T. was very happy with her foster family and wanted to stay with them.[3] A.T. told Ms. Pretus repeatedly she did not want to see or speak with A.A. A.T. reported that she was very distraught about A.A. attempting to lure her into a car when she was walking outside of her foster home. A.T.'s foster parents wanted to adopt A.T.

CASA reported that J.A. was a quiet, well-behaved boy and was very affectionate with his foster parents. J.T. was very loving toward his foster parents, and they were working with him to minimize his aggressive and disruptive behaviors. J.T. had made some improvements, but outbursts increased after visits with A.A. CASA recommended that the children stay in their foster placements, continue counseling, and that the case plan goal be changed to adoption.

A case review hearing was held on September 19, 2019. A.A. was present. After the hearing, the juvenile court found the case plan submitted by DCFS was in

---

[3] The report is erroneously dated September 9, 2010.

7

the best interest of children, approved the case plan, and changed the permanent plan to adoption. The juvenile court found that DCFS had made reasonable efforts to reunify the parents and children. The matter was set for a case review hearing on January 16, 2020.

On December 18, 2019, DCFS submitted a report to the juvenile court, stating that neither A.A. nor T.T. were working the case plan. A.A. admitted on December 5, 2019, at the DCFS office that she had not worked any part of the case plan. A.A. was advised that she needed to submit to a drug screen that day, but she left without the form for the drug screen. A.A. continued to refute the positive drug screen results for herself and her children, and continued to assert that DCFS was preventing her from visiting A.T. although A.T. repeatedly stated to her therapist, her attorney, and DCFS that she wanted no contact with A.A. DCFS reported that foster care workers had monthly visits with J.T., J.A., and A.T., that the children had safe, stable environments with their foster parents, and that their foster parents made them available for all scheduled appointments, court dates, and visitations, and ensured that they attended daycare or school regularly. The children had been on multiple trips, and were able to visit with each other regularly. DCFS recommended continued DCFS custody with the children in their foster care placements and that the goal remain adoption with a concurrent goal of guardianship.

A January 13, 2020 CASA report to the juvenile court reported that J.T., J.A., and A.T. were all doing well in their placements, had regular visits with each other, and had a healthy relationship. A.A. and T.T. had made no effort to work the case plan. Further, CASA reported that A.A.'s disruptive behavior and lack of cooperation with DCFS indicated that it was appropriate to continue with termination proceedings. CASA recommended that the children stay in their foster placements and continue counseling, and that the case plan goal remain adoption.

8

A case review hearing was held on January 16, 2020. The juvenile court found that the case plan submitted by DCFS was in the best interest of the children, determined that adoption was the most appropriate plan for the children and was in their best interest, and found that DCFS had made reasonable efforts to reunify A.A. and T.T. with J.T., J.A., and A.T. The matter was set for a case review hearing on April 15, 2020.

On March 5, 2020, DCFS filed a petition for termination of parental rights and certification for adoption of J.T., J.A., and A.T. DCFS asked that the parental rights of A.A. and T.T. be terminated under La. Ch.C. art. 1015(5) and (6) because A.A. and T.T. had failed to provide significant contributions to the children's care and support for six consecutive months from October 19, 2018, to March 5, 2020, and because A.A. and T.T. had failed to maintain contact with DCFS and failed maintain significant contact with the children for six consecutive months from August 8, 2019, to March 5, 2020.

DCFS maintained that the children had been in DCFS custody since September 27, 2018, had remained in custody for more than a year, that the parents had made no substantial compliance with the case plan, and that there was no reasonable expectation of significant improvement in A.A. and T.T.'s condition or conduct in the near future. DCFS maintained that the children needed a stable and permanent home and could not wait any longer for A.A. and T.T. to rehabilitate. Further, DCFS maintained that despite notice, A.A. and T.T. had failed or refused to effect a reasonable alternative placement for the children, other than foster care. DCFS asked for permanent termination of the rights of A.A. and T.T. to J.T., J.A., and A.T., and asked that the children be certified free and eligible for adoption.

On April 2, 2020, DCFS submitted a report to the juvenile court for the April 15, 2020 six-month hearing. The report found that A.A. presented documentation

on January 16, 2020 of employment at a restaurant, and a lease for a trailer she reported living in. A DCFS worker visited the trailer on February 28, 2020, and found it empty. On February 26, 2020, a DCFS worker spoke with a pastor at a church who confirmed he was providing A.A. with spiritual counseling. The pastor was not aware of a substance abuse issue. A supervisor with Hammond Addictive Disorders Clinic reported that A.A. was attending weekly group sessions and submitted to random weekly drug screens. Her last attendance was March 11, 2020, and phone sessions were conducted thereafter as the clinic was closed due to COVID. A.A.'s last drug screen had been on February 19, 2020, and it was negative. T.T. had not worked any part of his case plan and was non-compliant with Alabama's DCFS. T.T. refused to complete drug screens but did complete a psychological evaluation.

DCFS reported monthly visits with the children and their caregivers and that the children were in safe, stable environments. The caregivers made the children available for all scheduled appointments, court dates, visitations, and the children attended school and daycare regularly. DCFS reported that A.T. struggled with lying and stealing as A.A. made her steal things from stores before she was in foster care. DCFS recommended that the children continue in DCFS custody in their foster homes, and that the goal remain adoption with a concurrent goal of guardianship. Neither parent had made any significant effort to work their case plans to be reunited with the children. No viable relatives had been located to take the children.

A.A. began to make the payments of $33.33 per child as required by the case plan on January 10, 2020. A.A. continued these monthly payments through August 2020, and made total payments of $450.00 per child. A.A. also submitted several negative drug tests between January 2020 and July 2020; however, the tests were not from the provider assigned by DCFS, and therefore they were deemed positive as

10

non-compliant tests. In February of 2020, A.A. began treatment and was seeing a therapist through the Florida Parishes Human Services Authority.

On April 15, 2020, a case review hearing was held. The juvenile court found that the case plan was in the best interest of the children. The juvenile court ordered that the children stay in DCFS custody and approved the case plan goal of adoption with a concurrent goal of guardianship.

Trial of the matter was held on August 12, 2020, and September 30, 2020. At the trial, the State clarified that it was seeking to terminate A.A.'s parental rights under La. Ch.C. art. 1015(5)(b), and T.T.'s parental rights under La. Ch.C. art. 1015(5)(b) and (c). On November 4, 2020, the juvenile court signed a judgment terminating the parental rights of A.A. and T.T. to J.T., J.A., and A.T., and certifying the children free and eligible for adoption. A.A. is appealing that judgment.

**THE APPEAL**

A.A. makes two assignments of error.

1.  The juvenile court erroneously terminated A.A.'s parental rights because the State failed to prove grounds of abandonment by clear and convincing evidence.

2.  The juvenile court erroneously found that termination was in the best interest of the children because the State failed to prove an independent ground for termination.

**DISCUSSION**

Title X of the Louisiana Children's Code governs the involuntary termination of parental rights. **State ex rel. S.M.W.**, 2000-3277 (La. 2/21/01), 781 So.2d 1223, 1232. Permanent termination of the legal relationship existing between natural parents and children is one of the most drastic actions the State can take against its citizens. However, the primary concern of the courts and the State remains to secure the best interest of the child, including termination of parental rights if justifiable statutory grounds exist and are proven. **State ex rel. S.M.W.**, 781 So.2d at 1238.

11

In order to terminate parental rights, the petitioners need to establish at least one of the statutory grounds set out in La. Ch.C. art. 1015 by clear and convincing evidence. Even after finding that one or more of Article 1015's statutory grounds has been established, the trial court should not terminate a parent's rights unless it is determined that the termination is in the best interests of the child. It is well-settled that an appellate court cannot set aside a juvenile court's findings of fact in the absence of manifest error or unless those findings are clearly wrong. **In re K.A.L.,** 2014-1808 (La. App. 1 Cir. 5/19/15), 2015 WL 2412237, *3.

In assignment of error number one, A.A. maintains that the juvenile court erroneously terminated her parental rights because the State failed to prove grounds of abandonment by clear and convincing evidence. She maintains that the State failed to prove that she was able to make the payments, and that she was confused and did not understand that she needed to make the payments.

The grounds for termination of parental rights are set forth in La. Ch.C. art. 1015, and include:

> (5) Abandonment of the child by placing him in the physical custody of a nonparent, or the department, or by otherwise leaving him under circumstances demonstrating an intention to permanently avoid parental responsibility by any of the following:
>
> . . . . .
>
> (b) As of the time the petition is filed, the parent has failed to provide significant contributions to the child's care and support for any period of six consecutive months.

The children were taken into care in October of 2018. The testimony of the DCFS case manager, Tamu Walters, established that A.A. failed to pay support for the children in excess of six months. Walters testified that A.A. received a copy of the case plan at the October 19, 2018 family team meeting. The case plan required A.A. to pay nominal support in the amount of $33.33 per month per child, for a total of $100.00 per month. Walters testified that A.A. made no parental contributions to

12

the children's support from the date of the Family Team Meeting in October 2018 through December 2019. Ms. Walters testified that A.A. began making payments in January of 2020, for a total of $450.00 for each child through July 2020. A.A. admitted that she received a copy of the case plan initially.

In its oral reasons for judgment, the juvenile court found:

> the judgments state that the case plans were approved and [A.A.] signed them. . . . [A.A.], for the entire -- from September 27th of 2018, until December of 2019, did not pay parental contributions, which is certainly in excess of six months. . . . She knew that she had an obligation to do so. And after the case plan goal was changed to adoption, [A.A.] then began to start trying to pay parental contributions, certainly showing that she knew there was an obligation and knew that it was ordered for her to do so. . . . So she -- here all the sudden, she's trying to make up for payments that weren't paid. And still, you know, it was a little too late. Too little too late, I may add.

A.A. relies upon **State ex rel. A.L.D.**, 2009-0820 (La. App. 3 Cir. 11/4/09), 21 So.3d 1109, in her argument that the State was required to prove that she was able to pay support and was unwilling to do so. In **State ex rel. A.L.D.**, the third circuit reversed the district court's termination of the mother's parental rights for failure to pay significant contributions to the child's care and support for a period of six consecutive months and for lack of substantial compliance with the case plan with no reasonable expectation of significant improvement in the parent's condition or conduct in the near future. However, in that case the third circuit noted that the record contained no evidence that the mother was ever assessed an amount to be paid through Support Enforcement. **State ex rel. A.L.D.**, 21 So.3d at 1116. A.A. also cites **State ex rel. A.T.**, 2006-0501 (La. 7/6/06), 936 So.2d 79, in support of her arguments. In **State ex rel. A.T.**, the Louisiana Supreme Court affirmed this court's reversal of the termination of a mother's parental rights based upon La. Ch.C. art. 1015(4) and (5). However, in that case, the court noted that while testimony in the record indicated the mother did not make parental contributions toward her children's support for more than six months, the record also indicated that the

mother's wages were garnished to pay child support during her periods of employment and further, that the period of non-support coincided with a period of turmoil for the mother, including the break-up of her marriage, eviction from her home, and her lack of transportation. **State ex rel. A.T.**, 936 So.2d at 85, n. 7.

In this case, the record shows that A.A. was given a copy of the case plan in October 2018, showing that she needed to make the $100.00 per month parental contributions to her children's support. Further, A.A. attended several hearings where the case plan was continuously approved, and she failed to make any objections to the amount of the payment. In the March 18, 2019 DCFS report, it was noted that A.A. told DCFS she was working for someone named Sherry Forbes for 50-60 hours per week at $11 per hour. Then on August 27, 2019, A.A. informed a DCFS worker in a phone call that she was working in Shreveport. Yet, despite telling DCFS she had a job during these time periods, she failed to make even one token, partial payment toward her children's support during those time periods, or during the entire time period from September 27, 2018, through December 2019.

After thorough review, we find no manifest error by the juvenile court in finding that A.A. abandoned the children by failing to make any significant contributions to the children's care and support for a period of six consecutive months, in accordance with La. Ch.C. art. 1015(5)(b). This assignment of error has no merit.

In assignment of error number two, A.A. maintains that the juvenile court erred in finding that termination of her parental rights was in the best interest of the children because the State failed to prove an independent ground for termination.

A.T.'s therapist, Barbara Labee, testified at trial that she did not believe it was in A.T.'s best interest to reunify with her mother at that time. She testified that A.T. had a lot of damage and it would take a long time in therapy before it would be

14

appropriate to recommend visits between A.T. and A.A. Ms. Labee testified that A.T. was afraid of A.A., and that A.T. reported that A.A. would hit her with a board or a metal object if she refused to go into a store to steal things. Ms. Labee also testified that A.T. made it clear that she wished to remain in her foster home and be adopted.

The therapist for J.T. and J.A., Deanna Matthews, testified that J.T. and J.A. were both doing well and were thriving in their foster home, and that she did not recommend visits with A.A. because that would cause secondary trauma that they may not recover from.

The CASA advocate for the children, Ms. Pretus, testified that J.T., J.A., and A.T. were in very stable homes, had come a long way, and were doing very well. She testified that A.T. repeatedly told her she wished to stay with her foster parents, that A.T. told her she was afraid of A.A., and that A.T. said she would run away if sent back to live with A.A. Ms. Pretus testified that all three children had bonded with their foster parents and were flourishing. Ms. Pretus testified that she believed it was in the best interest of the children to stay in their foster homes, and she recommended termination of parental rights.

In its oral reasons for judgment, the juvenile court found:

> There has been a history with this family, with these children. And [J.T.] and [J.A.], they have been in care for over half of their lives. . . . And I say today that the placements that they're in today -- the brain architecture of these children is that their bonds are formed where they have been for the past -- past two years. They have structure. They have love. They have support. They are not abandoned. They don't just get, you know -- they're not just taken care of today and then there's a break or lapse in being supported financially or emotionally because . . . their parents or their care givers have decided that they needed to take a break for awhile. These children need constant care giving, constant financial support, constant structure. . . . And for me to remove these children would cause so much trauma that they may not be able to overcome that trauma, that they might not ever be able to regulate, that they might not ever be able to reach their full potential, and they might not ever allow someone to love and care for them ever again. . . . the best interest prong has certainly been met by the testimony of -- or

15

by the conference that was on the record by [A.T.] stating "please let me be safe. I feel safe." And I know she loves [A.A.]. But I know that [A.T.'s] scared, and that [A.T.] wants to be safe. The best interest has been met by these children being in a safe, structured environment, [J.T.] and [J.A.], for over half of their lives. So the best interest prong is met.

After thorough review, we find that the record supports the conclusion that termination of A.A.'s parental rights was in the best interest of J.T., J.A., and A.T., and we find no manifest error by juvenile court in finding that termination of A.A.'s parental rights was in the best interest of J.T., J.A., and A.T. This assignment of error has no merit.

## CONCLUSION

For the forgoing reasons, the November 4, 2020, juvenile court judgment terminating the parental rights of A.A. and T.T. to their minor children, J.T., J.A., and A.T., and certifying J.T., J.A., and A.T. as free and eligible for adoption, is affirmed. Costs of this appeal are assessed against A.A.

**AFFIRMED.**

16